E-FILED
Friday, 31 July, 2009  08:55:55 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JANET HATMAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07-3319 |
| | ) | |
| MEMORIAL MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on Defendant Memorial Medical Center's Motion for Summary Judgment (d/e 19).  Plaintiff Janet Hatmaker asserts that her former employer, Memorial Medical Center (Memorial), violated Title VII of the Civil Rights Act of 1964.[1]  Specifically, Hatmaker's Complaint (d/e 1) alleges that she experienced unlawful discrimination based on her gender in violation of 42 U.S.C. § 2000e-2(a) and that she was subjected to unlawful retaliation in violation of 42 U.S.C. § 2000e-3.  Memorial moves for summary judgment on each of Hatmaker's claims.  For

---

[1]Hatmaker also alleged claims against Memorial Health System, but those claims have been dismissed by stipulation.  See Text Order, dated March 14, 2008.

the reasons set forth below, Memorial's Motion for Summary Judgment is allowed.

## BACKGROUND

Memorial is a hospital located in Springfield, Illinois.[2]  Prior to June 18, 2007, Hatmaker was employed by Memorial.  Hatmaker's last position with Memorial was that of per diem chaplain, a position she held beginning August 23, 2001.  The record indicates that Hatmaker held other chaplain positions with Memorial prior to August 2001.  From July 1999 until December 27, 2006, Rev. Elizabeth Hawkins served as Memorial's Director of Pastoral Care.  During that period, Rev. Hawkins was Hatmaker's direct supervisor.  In September 2006, Rev. Hawkins took a medical leave of absence from Memorial, due to a serious health condition.  Rev. Hawkins died on December 27, 2006.

At the time Rev. Hawkins went on medical leave in September 2006, Memorial named Rev. Greg Stafford as Acting Director of Pastoral Care.  At all relevant times, Memorial Senior Vice President Forrest G. "Woody" Hester was Rev. Stafford's supervisor.  On February 19, 2007, Hester

---

[2]Unless otherwise noted, the information contained in this background section is taken from the facts deemed by both parties to be undisputed.

convened a meeting of the employees of Memorial's Pastoral Care Department and announced that Memorial had begun the process of locating a new Director of Pastoral Care. Hester also announced that Rev. Stafford had expressed interest in becoming the Director of Pastoral Care.

On February 25, 2007, Hatmaker emailed Hester regarding the meeting and the Director search. <u>Motion for Summary Judgment</u>, Ex. A, p. 10.[3] Hatmaker wrote that she had served under the directorships of Roy Nash, Ed Liddell, Gary Sproat, and Elizabeth Hawkins and had been able to observe the leadership abilities of each. Hatmaker wrote that she wanted to share some "observations and concerns about Greg's leadership abilities" in light of her prior interactions. <u>Id</u>. According to Hatmaker, during the time Rev. Stafford had been serving as Acting Director, "he has done an excellent job as a communicator, facilitator and connector for all of the ministerial subsets operating out of [the Pastoral Care] department." <u>Id</u>. Hatmaker further noted that Rev. Stafford's "warmth and approachability has been a distinct asset and his eagerness to do his very best has been

---

[3]The Court will generally reference the exhibits by the page numbers assigned by the Court's electronic filing system. However, after a deposition has been referenced and identified, the Court will use the deposition's internal page numbers to allow for more exact citation.

noticeable." Id.  Hatmaker deemed these characteristics to be "even more admirable given [Rev. Stafford's] newness on staff."  Id.  However, Hatmaker expressed concern "about Greg's presentation of himself in public and in representing our department." Id.  Specifically, Hatmaker noted that she had observed Rev. Stafford speak on several formal occasions and "was disappointed in his remarks and appropriateness."  Id.  According to Hatmaker, Rev. Stafford appeared to be "uncomfortable with himself and inexperienced in that role." Id.  Hatmaker recommended "some mentoring in this area" should Rev. Stafford be chosen as Director.  Id.

Hester responded by sending Hatmaker the following email: "Hi Janet and thank you for sharing your observations.  They are important to me. The outpouring of assistance as we think this matter through is very helpful. Let me know if you have more thoughts as time goes on.  /Woody."  Motion for Summary Judgment, Ex. A, p. 11; see also Motion for Summary Judgment, p. 3, Statement of Undisputed Material Fact No. 16; Plaintiff's Memorandum of Law in Opposition to Summary Judgment (Hatmaker's Opposition), p. 2 (conceding Defendant's Statement of Undisputed Material Fact No. 16).

On March 6, 2007, Hatmaker sent another email to Hester.  The

record contains a true and accurate copy of this email, Bates stamped
MMC014.  <u>Motion for Summary Judgment</u>, Ex. A, p. 5, Request to Admit
No. 21, & p. 11.  Hatmaker wrote that she had been on-call the previous
Sunday night and, on Monday, June 5, she had reported in before going off
duty to three named individuals, including Rev. Stafford.  According to
Hatmaker, during the brief report time, she realized her continuing
discomfort with Rev. Stafford in a leadership role.  Hatmaker reported as
follows:

> At the expense of sounding nit-picking, it feels to me like he is
> trying so much to be a "good ole boy" and friend that he
> sacrifices dignity and leadership in exchange for popularity.
> There are no specifics in the content of our interchange that I
> can site [sic] but the feeling that I came away with is one of
> disappointment.  He seems to major in small talk, [sic] In short,
> he does not strike me as a spiritual statesman.  Although I was
> not personally as drawn to Roy Nash, Gary Sproat and
> Elizabeth Hawkins on a spiritual level as to Ed Liddell, I saw
> each of them as spiritual statesmen/woman in comparison.  They
> invited my respect in the area of leadership.  Greg does not.  I
> feel like he sees himself as the great entertainer.
>
> Since I will be going out of town for several weeks following my
> next Sunday night (3/11) on-call coverage, I wanted to
> communicate with you about my observations and feelings
> before they become distant . . . for whatever they are worth.
> Thanks for welcoming our input.

<u>Id</u>., p. 11.

On March 26, 2007, Hester issued a letter to Memorial's Pastoral Care staff, announcing that Rev. Stafford had accepted the Director of Pastoral Care position.  Hester testified in his deposition that he chose Rev. Stafford over other applicants for the position based on a review of the candidates' background experience, credentials, relationships with the community of clergy, and relationships within Memorial.  On March 30, 2007, Hatmaker sent an email to Rev. Stafford, congratulating him on his appointment and offering to support him in the ways she could be most helpful.

On April 20, 2007, a meeting occurred between Hatmaker, Rev. Stafford, and Brenda Edens, who was the head of the pain management team at Memorial.  Rev. Stafford called the meeting.  Its purpose was to discuss Reiki therapy, a Japanese technique similar to touch therapy.  Hatmaker is trained and certified in Reiki.  When Rev. Hawkins was Director of Pastoral Care, she required all of the staff chaplains to become certified in Reiki.  Hatmaker testified that, prior to Rev. Stafford being hired as a chaplain, Hatmaker expressed discomfort to Rev. Hawkins about male chaplains performing Reiki. Motion for Summary Judgment, Ex. C, p. 1-36, Deposition of Janet Hatmaker (Hatmaker Dep.), p. 15-16.  Hatmaker also

testified that, after he was hired, Rev. Stafford expressed his discomfort with Reiki to her.  Id., p. 16-17.  With respect to the April 20, 2007, meeting, Hatmaker testified that Rev. Stafford stated that he wanted to put Edens and Hatmaker in touch with one another because Rev. Stafford was uncomfortable with Reiki.  Hatmaker characterized Rev. Stafford's conduct at the meeting as "very complimentary" to her, "very gentlemanly," "very honoring of [Edens and Hatmaker]," and "very professional."  Id., p. 18-19. According to Hatmaker, Rev. Stafford stayed at the meeting for approximately fifteen or twenty minutes, at which point he said he had another meeting and left.  Hatmaker testified that there was nothing inappropriate or objectionable about Rev. Stafford's behavior at the April 20, 2007, meeting.  Id., p. 19.

On April 30, 2007, Hatmaker sent a lengthy email to Hester to share some concerns regarding Rev. Stafford.  An accurate copy of the email is included in the record with the Bates stamp MMC019.  See Motion for Summary Judgment, Ex. A, p. 5, Request to Admit No. 28, & p. 14-15. Hatmaker wrote that she was "stunned by the news of Greg's appointment" and "puzzled and troubled" when she read of the outpouring of support for Rev. Stafford.  Motion for Summary Judgment, Ex. A, p. 14.  She stated

that she expected the search process to be "an exploration . . . rather than the outcome of a voting campaign." Id. Additionally, Hatmaker wrote as follows: "Given my previous letters to you, I am sure it comes as no surprise that I had/have reservations." Id. Hatmaker informed Hester that she continued "to have question marks about [Rev. Stafford's] leadership in relationship to women." Id.

Hatmaker wrote that, in the eighteen months since Rev. Stafford began working as a staff chaplain at Memorial, several female clergy at Memorial and St. John's Hospital, another local hospital, had expressed their discomfort with him to Hatmaker. Motion for Summary Judgment, Ex. A, p. 14. Hatmaker reported that, in several conversations she had with Rev. Stafford, "he quickly referenced his 2 divorces and his distrust/discomfort with women." Id. Hatmaker wrote that Rev. Stafford's "obvious attraction to/fear of women raises many questions . . . about whether he has addressed or been addressed by this significant issue in his Clinical Pastoral Education training." Id. Hatmaker stated that she was puzzled as to why it was not noted that Rev. Stafford was only provisionally certified in the College of Chaplains, despite eighteen years of experience in

chaplaincy.[4]  She opined that Rev. Stafford's "lack of self knowledge in regard to women and intimacy/partnership" could be part of his provisional certification.  Id.  Hatmaker characterized "the gender issue of particular importance" based on Rev. Stafford's work with women in the Pastoral Care Department and with women nurses and caregivers at Memorial.  Id.

Hatmaker also stated an immediate concern about how Rev. Stafford's "seeming (perhaps unconcious [sic]) diminished view of same age or younger women . . will affect staffing in the Pastoral Care Dept."  Motion for Summary Judgment, Ex. A, p. 14.  Hatmaker conceded that Rev. Stafford seemed "to do better with older women."  Id.  Hatmaker noted specific concerns about the "only female staff chaplain, Rev. Julie Hoving, as well as the department's search for another staff chaplain."  Id.  Hatmaker stated her hope that the new staff chaplain would be female, "as an appropriate compliment to the dept."  Id.  Hatmaker closed her email as follows:

> It is with these observations that I recommend your highly focused oversight of Greg in this area. . . .  In case you wonder, I find Greg to be affable, capable and ambitious.  He is a fine

---

[4]Hatmaker noted her understanding that all previous Directors of Pastoral Care had been certified through this organization, with the possible exception of Rev. Hawkins.

man with noble aims and a magnetic personality.  However it is the question marks I site [sic] above along with observations from my previous letters to you that raise red flags for me; I would feel irresponsible if I did not share them with you. Thanks for hearing me out.

Id., p. 14-15.

Hatmaker testified that, on two occasions, she heard Rev. Stafford say that he had been divorced twice, and did not "do women well."  Hatmaker Dep., p. 49-50.  Hatmaker also explained in her deposition that, prior to April 30, 2007, she had discussions regarding Rev. Stafford with five women, namely Julie Blythe, Julie Hoving, Anne Kelson, Sister Anna Marie Mehigan, and Dawn Victor.  Prior to the time that Rev. Stafford became the Director of Pastoral Care, Julie Blythe, a staff chaplain at St. John's Hospital, told Hatmaker that Blythe was unimpressed and uncomfortable with Rev. Stafford and surprised that he was part of Memorial's Pastoral Care staff.  Id., p. 56-58.  Julie Hoving was a staff chaplain at Memorial. Hoving told Hatmaker that she did not find Rev. Stafford helpful when she went to him with problems and that she was not having her needs met in staff meetings.  Id., p. 45-46.

Anne Kelson, a per diem chaplain at Memorial, told Hatmaker that she was disappointed that Rev. Stafford had been named Director, but did

not elaborate as to her reasons for feeling this way.  Hatmaker Dep., p. 63-64.  Sister Anna Marie Mehigan, also a per diem chaplain at Memorial, told Hatmaker that she was "stunned" by an example relating to a restroom that Rev. Stafford made during a discussion regarding teamwork.  Id., p. 53-54.  Sister Anna Marie told Hatmaker that Rev. Stafford illustrated teamwork by noting that Rev. Stafford, Memorial's CEO, and Memorial's vice president all used the same bathroom.  Id.  Sister Anna Marie reported this comment to Memorial administration, but did not feel that a resulting meeting on the issue went well.  Id., p. 54.  Dawn Victor, a hospice chaplain, told Hatmaker that she felt uncomfortable with Rev. Stafford prior to Rev. Hawkins' death because Rev. Stafford would make comments making fun of or undermining Rev. Hawkins.  Id., p. 58-59.  Victor did not give specifics of the comments, but told Hatmaker that she had informed Rev. Stafford that she did not appreciate the way he was talking about Rev. Hawkins.  Id., p. 59-60.

After reading Hatmaker's April 30, 2007, email, Hester directed Anita Lengacher, a Memorial employee relations specialist, to open an investigation to determine whether a hostile work environment toward women was present within the Pastoral Care Department.  On either April

30 or May 1, 2007, Hester asked Hatmaker to discuss her concerns with Lengacher. On April 30, 2007, Hester also informed Rev. Stafford that Hatmaker had expressed concern about gender issues in the Pastoral Care Department and that he might be questioned by a member of Memorial's employee relations team. That evening, Rev. Stafford emailed Hester, noting that at Hester's request he was forwarding a copy of Hatmaker's congratulatory email dated March 30, 2007. <u>Motion for Summary Judgment</u>, Ex. B, p. 32-33. In his email, Rev. Stafford characterized Hatmaker's comments as unfounded.

In an email dated May 1, 2007, Hatmaker informed Hester that everything that she wanted to express had been contained in her previous letter and that he could forward the letter to Lengacher. Hatmaker stated her opinion that it would be superfluous to give the matter any more time or attention. Hatmaker noted that her ultimate desire was for Hester to provide highly focused oversight of Rev. Stafford with respect to the issues that she raised. Hester replied by email that he wanted Hatmaker to meet with Lengacher and then with him. Hester characterized the matter as important.

Hatmaker responded to Hester in another email, as follows:

Woody, thanks for considering my imput [sic] important. However, without diminishing its value, I have already called Anita back with the same message I emailed to you. If you and she consider it that important to meet face to face I am willing to do so; my main concern is about oversight.

As I age I realize that we all grow and change; my hope/concern is that Greg is on a path of insight that will not only help him professionally but for his own happiness. That is where I would recommend that he have a spiritual director/counsellor [sic] to help him deal with the issues (in my opinion) that I reference. When I was staff chaplain I had such a person in Ed Liddell to help me deal with my own shadow issues. I wish that Greg had access to such spiritual mentorship as I did. Perhaps Ed set such a high standard that I have problems accepting any less in a director. Ultimately, at this point in time, I am concerned about [Pastoral Care] leadership at [Memorial] and how that translates for [Pastoral Care] staff. I imagine Greg does very well with patients, families and male clergy; he is a very caring man. My concern is about the bigger picture, especially as it concerns women.

See Motion for Summary Judgment, Ex. A, p. 6-7, Request to Admit No. 31, & Ex. B, p. 34. Hester responded by email that he understood, but wanted Hatmaker to meet with Lengacher and then with him. Hester asked Hatmaker to arrange those meetings. Hatmaker testified that she did not believe that Hester's email placed any burden on her to arrange a meeting with Hester. She believed that, after she met with Lengacher, Hester would call her to set up a meeting. Hatmaker Dep., p. 84.

On May 7, 2007, Hatmaker met with Lengacher for about an hour.

13

Lengacher prepared a written summary of the conversation.  See Motion for Summary Judgment, p. 10-11, Statement of Undisputed Material Fact No. 41; Hatmaker's Opposition, p. 2 (conceding Defendant's Statement of Undisputed Material Fact No. 41).  Hatmaker examined the summary during her deposition and testified regarding it.  Hatmaker Dep., p. 88-98.  The following statements from Lengacher's summary were deemed to be accurate by Hatmaker.  Hatmaker felt that Rev. Stafford had gender problems with women, specifically including problems putting down Rev. Hawkins and an inherent sexist attitude due to the fact that he was a Southern Baptist and a part of a "good ole boys network."  Motion for Summary Judgment, p. 10, Statement of Undisputed Material Fact No. 41; Hatmaker Dep., p. 92.  Hatmaker did not provide Lengacher with any examples of Rev. Stafford treating her differently than anyone else in the Pastoral Care Department.  Hatmaker informed Lengacher that Julie Hoving was reluctant to interact with Rev. Stafford due to Stafford's tendency to take center stage and tell the same stories over and over during conversations.  According to Hatmaker, Dawn Victor informed Hatmaker that Rev. Stafford criticized Rev. Hawkins and tried to include himself in lunches with other Pastoral Care employees.  Hatmaker also stated that Julie

Blythe told Hatmaker that she felt his sexism the minute she met Rev. Stafford.  Hatmaker reported that Rev. Stafford put down women, but could not provide any examples of this.  Hatmaker also commented on Rev. Stafford's lack of public speaking sophistication, her concern about Rev. Stafford working with the mostly female nurse population, and his sad history with women (i.e., two divorces, mother committed suicide, and new boss Rev. Hawkins passed away).

Hatmaker testified in her deposition that Lengacher's summary failed to reflect that four or five times during the conversation Hatmaker informed Lengacher that she was asking for oversight and not focusing on her interactions with Rev. Stafford.  Hatmaker Dep., p. 96-97.  According to Hatmaker, Lengacher failed to note that Hatmaker mentioned Sister Anna Marie during the meeting.  Hatmaker also testified that she did not tell Lengacher that Rev. Stafford needed psychotherapy to deal with women abandonment issues, but rather stated that, under similar circumstances she would seek therapy.  Id., p. 97.

Shortly after the meeting ended, Hatmaker emailed Lengacher to note that a rabbi and a priest were two of the clergy who "wrote raving reviews" for Rev. Stafford.  Motion for Summary Judgment, Ex. A, p. 7, Request to

Admit No. 33, & Ex. B, p. 39.  Hatmaker pointed out that these two men came from religions which exclude females from the clergy.  Hatmaker commented on the lack of female clergy participation during Rev. Hawkins' memorial services.  Hatmaker also wrote that she was puzzled by the media's decision to interview black male clergy rather than black female clergy in connection with recent gender issues.  Hatmaker noted "a not so subtle thread that continues to dismiss women regardless of color."  Motion for Summary Judgment, Ex. B, p. 39.  Lengacher forwarded a copy of this email to Hester.

On May 10, 2007, Hatmaker and Rev. Stafford attended a Grief Seminar sponsored by a local funeral home.[5]  Hatmaker spent about ten minutes introducing Rev. Stafford to other individuals prior to the seminar. According to Hatmaker, Rev. Stafford did not want to engage in eye contact with her during this time.  Hatmaker also testified that Rev. Stafford greeted the people that she introduced to him, but did not engage in conversations

---

[5]The Court notes that, while Hatmaker initially testified that the Grief Seminar occurred in early April 2007, she later clarified that the seminar was in May 2007. Hatmaker Dep., p. 9-10, 20.  Hatmaker also fails to dispute Memorial's Undisputed Material Fact No. 46, which places the Grief Seminar on May 10, 2007.  Motion for Summary Judgment, p. 12, Statement of Undisputed Material Fact No. 46; Hatmaker's Opposition, p. 2 (conceding Defendant's Statement of Undisputed Material Fact No. 46).

with them.

At approximately 5:00 p.m. on May 10, 2007, Hatmaker emailed Rev. Stafford.  She wrote that she was sensing increased distance between them and felt a wall building between them at the Grief Seminar.  Hatmaker stated that she wanted to address the issue before the wall became higher and asked if they could have a conversation.  Rev. Stafford responded in an email dated May 11, 2007, stating that he would be willing to meet with Hatmaker.

Meanwhile, Hester was reviewing the summary of Lengacher's interview with Hatmaker and Hatmaker's follow up email.  Hester testified that he concluded "that the perceived gender problem in the department was just that, a perceived gender problem that Janet held an opinion about and it was personal for her." Motion for Summary Judgment, Ex. B, p. 1-24, Deposition of Forrest G. Hester, III (Hester Dep.), p. 45.  Hester clarified that it was clear to him that Hatmaker "perceived there were gender problems in the world . . . that this was a concern that she held that transcended Memorial Health System and really [they] were dealing with a bigger issue here than Greg Stafford." Id.

On May 10, 2007, Hester asked Lengacher to meet with Hatmaker

and convey the following messages: (1) after review, it was determined that there was not a hostile work environment/sexual harassment issue in the Pastoral Care Department, (2) Rev. Stafford is the Director of the Department and if Hatmaker is uncomfortable working for him she should resign, (3) while Hatmaker is entitled to her opinions on gender conflicts in general, it is not appropriate to discuss these opinions in the workplace, and (4) Hatmaker should not attempt to represent concerns or opinions of others.  On May 11, 2007, Hatmaker and Lengacher met for about an hour and fifteen minutes.   Lengacher prepared a written summary of the conversation, which Hatmaker examined and testified regarding during her deposition. Hatmaker Dep., p. 112-19; Motion for Summary Judgment, Ex. C, p. 53.

Hatmaker testified that she informed Lengacher that she was asking for oversight of Rev. Stafford and she found it undermining and punishing to be told that she should not do certain things.  Hatmaker concedes that Lengacher informed her that Rev. Stafford had the full support of the administration and that, if Hatmaker is unable to support him, she should consider whether it is appropriate for her to continue working for Memorial. Hatmaker testified that she expressed "concern over potential hostile work

environment" and was "asking for oversight to prevent a hostile work environment." Hatmaker Dep., p. 116.  Hatmaker asserts that she assured Lengacher several times that she personally had no problems with Rev. Stafford, because she did not see him at work, but that she was concerned about other women in the workplace.  Id., p. 116-17.  Hatmaker acknowledges that she was instructed to bring any future concerns to Lengacher and that discussing these concerns with anyone other than Lengacher would be considered inappropriate.  Id., p. 117.

The meeting ended affably, and Hatmaker viewed the matter to be concluded.  However, upon further reflection, Hatmaker deemed her concerns to be not properly heard and decided to write another email to Hester and Lengacher.  An accurate copy of that email, dated May 11, 2007 is included in the record.  Motion for Summary Judgment, Ex. A, p. 8, Request to Admit No. 40, & Ex. C, p. 54.  In the email, Hatmaker reiterated that she was seeking increased oversight of Rev. Stafford.  Hatmaker expressed sadness that her actions were perceived to be negative and undermining of Rev. Stafford.  Hatmaker wrote: "Since my communication with you was seemingly perceived as a reminder for me to be more positive and supportive of Greg's leadership rather than a helpful red flag for your

monitoring purposes, I will direct further concerns and/or communications to Greg directly with hope that he will seek professional guidance." <u>Motion for Summary Judgment</u>, Ex. C, p. 54.  Hatmaker stated that, in the past, she had encouraged women to talk directly with Hester or Stafford, but noted that her experience during the past week caused her to question this advice. Hatmaker wrote that she felt like she "was being silenced, dismissed and encouraged to get with the program." <u>Id</u>.  Additionally, Hatmaker stated as follows:

> [A]s I talk with Greg directly in the future, I would appreciate knowing what issues you have discussed with him, to which my name has been attached.  His increasing distance from me tells me that I am perceived by him as an unsafe person.  I am truly sad about this, given your assurance to me of confidentiality.

<u>Id</u>.

When Hester received Hatmaker's email, he was concerned about Hatmaker's continued questioning of Rev. Stafford and her seeming inability to move on.  He thought that Hatmaker might be unwilling to support the Pastoral Care Department or Rev. Stafford.  As a result, Hester directed that Hatmaker not be scheduled to work for thirty days so that she could take time to consider her feelings and her position at Memorial. Lengacher advised Hatmaker in a phone call on May 15, 2007, that she was

being taken off the work schedule so that she could think through her feelings and consider whether she wanted to remain in the Department. Lengacher asked Hatmaker to call her back in thirty days.  As a result of her removal from the work schedule for thirty days, Hatmaker lost four days of work.

On or about June 15, 2008, Hatmaker called Lengacher and set up an appointment to come in and speak to her about her employment as chaplain.  On June 18, 2007, Hester called Hatmaker and advised her that Memorial had decided that she would not be scheduled for future shifts, ending Hatmaker's employment with Memorial.  Hester testified that he terminated Hatmaker's employment because he "had seen nothing that led [him] to believe that she had put her concerns behind her" and he "was of the opinion that her continued presence in the department would be disruptive."  Hester Dep., p. 70.  Hester testified that he did not remember whether he reached this decision before he contacted Hatmaker or while he was talking with her on the phone.  Hester's testimony suggests that, at the time he called Hatmaker, she had not yet contacted Memorial; however, as previously noted, Memorial deems undisputed the fact that Hatmaker contacted Lengacher on or about June 15, 2008, to set up a meeting.

According to Hatmaker, the day after she called Lengacher to schedule the appointment, Hester called her at home to tell her that her employment was terminated.  <u>Hatmaker Dep.</u>, p. 130-31.  The instant litigation followed. Memorial now seeks summary judgment on each of Hatmaker's claims.

<u>ANALYSIS</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>Fed. R. Civ. P.</u> 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  When a properly supported motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set out specific facts showing a genuine issue for trial."  <u>Fed. R. Civ. P.</u> 56(e)(2).  "A party must present more than mere speculation or conjecture to defeat a summary judgment

motion." <u>Liu v. T & H Machine, Inc.,</u> 191 F.3d 790, 796 (7th Cir. 1999). The Court must consider the evidence in the light most favorable to the non-moving party, here Hatmaker, and draw all reasonable inferences in her favor.  <u>See Anderson</u>, 477 U.S. at 255.

Hatmaker's Complaint alleges that she experienced unlawful gender discrimination and that she was subjected to unlawful retaliation.  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," based on the individual's gender.  42 U.S.C. § 2000e-2(a)(1). Title VII also contains a two clause antiretaliation provision, "making it 'an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"  <u>Crawford v. Metropolitan Government of Nashville and Davidson County</u>, 129 S.Ct. 846, 850 (2009) (<u>quoting</u> 42 U.S.C. § 2000e-3(a)).  The first clause is known as the "opposition clause," while the second is known as the "participation clause."  <u>Id</u>.

23

In her response to the pending Motion for Summary Judgment, Hatmaker concedes that Memorial is entitled to summary judgment on her substantive gender discrimination claim.  Hatmaker's Opposition, p. 2, 14. Thus, the Motion for Summary Judgment is allowed as it relates to this claim, and the Court turns its attention to Hatmaker's claim of retaliation.

A Title VII plaintiff may establish a prima facie case of retaliation, sufficient to overcome a motion for summary judgment, under either the direct method or the indirect method.  Sitar v. Indiana Dept. of Transp., 344 F.3d 720 (7th Cir. 2003).  While Hatmaker briefly references the indirect method, she fails to develop her argument with respect to this approach.  Thus, any argument that Hatmaker could successfully establish a prima facie case under the indirect method is waived.  Moreover, even if preserved, Hatmaker's argument would fail because the record is devoid of evidence of a similarly situated employee who did not engage in protected conduct, a required element of a prima facie retaliation case under the indirect method.  See Amrhein v. Health Care Service Corp., 546 F.3d 854, 859 (7th Cir. 2008).

Under the direct method, Hatmaker "must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the

employer; and (3) a causal connection between the two." <u>Sitar</u>, 344 F.3d at 728. Hatmaker can use either "direct evidence" or "circumstantial evidence" to show that her protected activity motivated Memorial's decisions to suspend her from work for thirty days and ultimately to terminate her employment. <u>Amrhein</u>, 546 F.3d at 858. The Seventh Circuit instructs as follows:

> Direct evidence is evidence which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption, which typically involves an admission by the decision maker regarding the retaliatory intent. Because direct evidence of discriminatory intent is rare, a plaintiff can also offer circumstantial evidence, which allows the trier of fact to infer intentional discrimination by the decisionmaker, typically through a longer chain of inferences.

<u>Id</u>. (internal quotations and citations omitted). Memorial asserts that summary judgment is appropriate because Hatmaker cannot establish that she engaged in statutorily protected activity or that a causal connection exists between her activity and the adverse employment actions.

The Court begins with the first element -- statutorily protected activity. Hatmaker claims that her conduct satisfies both the opposition and participation clauses of 42 U.S.C. § 2000e-3(a). The Court first analyzes whether Hatmaker has identified facts sufficient to support a

finding that she opposed an unlawful employment practice under Title VII. It is clear from the record that Hatmaker never complained that she had been personally sexually harassed by Rev. Stafford.  However, Hatmaker argues that statements made in her April 30, 2007, email to Hester, in her May 7, 2007, email to Lengacher, in her May 11, 2007, email to Hester and Lengacher, and during her two interviews with Lengacher constitute opposition to gender discrimination.

In the April 30, 2007, email, Hatmaker questioned Rev. Stafford's leadership in relationship to women.  She informed Hester that several female members of the clergy had expressed "discomfort" with Rev. Stafford. Motion for Summary Judgment, Ex. A, p. 14.  Hatmaker expressed concern over the ways in which Rev. Stafford's "seeming . . . diminished view of same age or younger women" would affect staffing in the Pastoral Care Department. Id.  She also expressed concern for Rev. Hoving, Memorial's only female staff chaplain.

Hester responded to the April 30, 2007, email by initiating a meeting between Hatmaker and Lengacher, which occurred on May 7, 2007.  During that meeting, Lengacher questioned Hatmaker about the statements in her April 30, 2007, email, including the discomfort with Rev. Stafford that

26

female members of the clergy had expressed.  Hatmaker stated that Rev. Hoving was reluctant to interact with Rev. Stafford due to his tendency to take center stage and tell the same stories over and over.  Without providing details, Hatmaker stated that Blythe felt sexism the minute she met Rev. Stafford.  Hatmaker also informed Lengacher, without providing specifics, that Rev. Stafford put down women in general and Rev. Hawkins particularly.  Hatmaker explained that, due to Rev. Stafford's background, she was concerned about his diminished view of women in ministry. Hatmaker also expressed an opinion that Rev. Stafford had gender problems with women and an inherent sexist attitude due to the male dominated cultures with which he associates.

In the April 30, 2007, email, Hatmaker questioned why women clergy were not included in Rev. Hawkins' memorial service and explained that Rev. Stafford came from a religion that excluded women from the clergy. She also referenced a then-current incident involving radio talk show host Don Imus and the Rutgers' women's basketball team as an example of a not so subtle threat that continues to dismiss women regardless of color.

Lengacher and Hatmaker met again on May 11, 2007.  In her deposition, Hatmaker testified as follows concerning this meeting: "I did

express concern over potential hostile work environment to her, no sexual harassment or sexual discrimination, but I did express to her that I had concerns, and that's why I was again asking for oversight to prevent a hostile work environment." <u>Hatmaker Dep.,</u> p. 116.  Hatmaker concedes that she assured Lengacher several times that she personally had no problems with Rev. Stafford, but that she was concerned about other women in the workplace.  <u>Id</u>., p. 116-17.  Hatmaker explained that she informed Lengacher that she "was trying to prevent any problems happening."  <u>Id</u>., p. 118.

Finally, Hatmaker points to her May 11, 2007, email, specifically the following statement: ". . . the purpose of my recent letter was to express a concern related to Greg's interaction with women as well as faith traditions . . . that exclude women from ordained ministry."  <u>Motion for Summary Judgment</u>, Ex. C, p. 54.  In that same email, however, Hatmaker clarifies that she "was asking for **oversight**," which she expressly describes as administrative monitoring of departmental interactions and hirings with the awareness of "possible gender issues."  <u>Id</u>. (emphasis in original). Furthermore, Hatmaker testified in her deposition that the May 11, 2007, email was "not anything to do with Greg" but rather intended to express her

disappointment in Lengacher's treatment of her during the Human Resources response to her complaint.  Hatmaker Dep., p. 121.

According to Memorial, Hatmaker at most opposed Rev. Stafford's potential for gender discrimination.  The Court agrees.  The record is devoid of evidence that Hatmaker complained of any actual gender discrimination by Rev. Stafford.  The Court is cognizant of the fact that Hatmaker does not need to prove that the underlying conduct, of which she complained, was actually serious enough to constitute a Title VII violation, but rather that, when instituting her complaint, she had a "sincere and reasonable belief" that she was opposing a practice which violated Title VII.  Magyar v. Saint Joseph Regional Medical Center, 544 F.3d 766, 771 (7th Cir. 2008). Under Seventh Circuit precedent, if an employee complains and the employer fires her because of the complaint, the retaliation claim could still be valid, even if the conduct complained of does not reach the level where it constitutes a violation of Title VII.  See Hamner v. St. Vincent Hosp. and Health Care Center, Inc., 224 F.3d 701, 707 (7th Cir. 2000).  However, "the complaint must involve discrimination that is prohibited by Title VII."  Id.

It is clear from the record that Hatmaker did not believe she had been discriminated against by Rev. Stafford.  Furthermore, there is no evidence

to support a finding that Hatmaker subjectively believed that others had been subjected to gender discrimination or a hostile work environment.  In her deposition, Hatmaker testified repeatedly that her purpose was to prevent these type of problems from happening.  See e.g., Hatmaker Dep., p. 116, 118.  Viewed in the light most favorable to Hatmaker, the record reveals that Hatmaker sincerely believed that Rev. Stafford had gender issues that could potentially cause a hostile work environment.  It is not reasonable, however, to believe that mere potential for gender discrimination violates Title VII.  "The objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute."  Magyar, 544 F.3d at 771.  Title VII prohibits discrimination based on gender, not the potential for discrimination based on gender.  Thus, Hatmaker cannot establish that she had a sincere and reasonable belief that she was opposing a practice which violated Title VII in her interactions with Hester and Lengacher.  Hatmaker's conduct falls outside the opposition clause of 42 U.S.C. § 2000e-3(a).

The participation clause of 42 U.S.C. § 2000e-3(a) prohibits

retaliation against an employee who has made a charge, testified, assisted, or participated in any manner in an investigation under Title VII. Memorial asserts that Hatmaker's Complaint fails to allege a participation clause claim. The Court agrees. The Complaint asserts that during 2007, Hatmaker repeatedly objected to what she perceived to be gender discrimination by Rev. Stafford, by writing letters and meeting with representatives of Memorial. Complaint, ¶ 6. According to the Complaint, "[a]s a result of Hatmaker's opposition to gender discrimination by her supervisor she was retaliated against" on three separate occasions. Id., ¶ 7. Hatmaker alleges that she suffered adverse treatment, "in retaliation for [her] complaints of what she legitimately perceived to be gender discrimination by her supervisor" and, furthermore, that her employment "would not have been terminated had it not been for her vocal opposition to actions which she perceived as gender discrimination." Id., ¶¶ 8-9. This is the extent of the allegations relating to retaliation. These allegations are insufficient to put Memorial on notice that Hatmaker intended to raise a participation clause claim in addition to an opposition clause claim. The Seventh Circuit instructs that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary

judgment." <u>Grayson v. O'Neill</u>, 308 F.3d 808, 817 (7th Cir. 2002).  Thus, the Court finds that Hatmaker waived this alternative basis for her retaliation claim.

Moreover, even assuming it is properly alleged, Hatmaker's participation clause claim fails at summary judgment.  Undeniably, Hatmaker participated in Memorial's investigation of her complaints.  It is also undisputed that, after receiving Hatmaker's April 30, 2007, email, Hester directed Lengacher to investigate whether a hostile work environment toward women existed in the Pastoral Care Department. However, as set forth above, Hatmaker's complaints involved only the potential for discrimination; she did not allege that any actual Title VII violation had occurred.  The Seventh Circuit has determined that the good faith, reasonableness requirement extends to participation clause cases as well as those brought under the opposition clause.  <u>Mattson v. Caterpillar, Inc.</u>, 359 F.3d 885, 890-91 (7th Cir. 2004).  While Title VII protection is not lost simply because an employee is mistaken on the merits of her complaint, utterly baseless claims do not receive protection under Title VII. <u>Id</u>. at 890.  This is not a case in which Hatmaker complained about discriminatory conduct that failed to rise to the level necessary to constitute

a Title VII violation.  Hatmaker concedes that her purpose was to prevent gender discrimination from occurring in the Pastoral Care Department. There is no evidence that any gender discrimination had occurred, nor did Hatmaker perceive that it had.  Thus, any claimed violation of Title VII would be completely baseless.  Although Hester directed an investigation to determine whether a hostile work environment existed, that investigation resulted from Hatmaker's complaints which involved conduct that fell outside of Title VII, both objectively and subjectively.  See Howell v. North Central College, 331 F.Supp.2d 660, 664-65(N.D. Ill. 2004) (rejecting the argument that an underlying harassment claim that is objectively groundless, such as a sexual orientation claim under Title VII, can provide the basis for a retaliation claim).  Given the unique, undisputed facts of the instant case, the Court finds that Hatmaker's conduct is not entitled to protection under the participation clause of Title VII.

Because the evidence, viewed in the light most favorable to Hatmaker, is insufficient to establish that Hatmaker engaged in statutorily protected activity, the Court need not address the causal connection prong.  Memorial is entitled to summary judgment on Hatmaker's Title VII retaliation claim.

<u>CONCLUSION</u>

For the reasons set forth above, Defendant Memorial Medical Center's Motion for Summary Judgment (d/e 19) is ALLOWED.   Judgment is entered in favor of Memorial Medical Center and against Plaintiff Janet Hatmaker on all claims.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   July 31, 2009

FOR THE COURT:

<u>        s/  Jeanne E. Scott         </u>
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE